Good morning, Your Honors. May it please the Court, Robert Swain for Appellant Robert Torres. Mr. Swain. Your Honors, the government star witness, central witness, only witness who was inside the alleged conspiracy testified falsely that he was going to get 15 years in prison. This was exacerbated by the fact that the government elicited that testimony on direct examination and then pounded it home in closing argument. Wasn't it corrected? And I'm not saying that what the prosecutor did was commendable. In fact, it's just the opposite. But didn't it somewhat ironic that it appears to me that on cross-examination, defense counsel actually got the defendant to acknowledge that the eight years was just a cap and the sentence could be eight years and below. Well, it's true on cross-examination. At one point, the defense attorney did say it used to be ten and up. Now it's eight or less. So what's the prejudice? It's eight or less. Well, the prejudice in particular is what we're focused on is the seven-year consecutive sentence, which was portrayed as an absolute certainty that was going to occur. Less than three weeks before the trial testimony, the witness was in State court asserting the position that he'd been in for the last six months or so that he wasn't even on probation. And so it was hardly a certainty. And, in fact, as we know from the month after the trial, the State court found he wasn't on probation. The court had no jurisdiction because probation had already expired before the State filed a petition. One indication is there that the prosecutor knew about that. I mean, if you look at – I mean, I don't think you oppose their motion to take judicial notice of the earlier proceedings, the proceedings before the judge said it expired. And it seemed to me that if you were to read that, you would think that he was still on probation and that it was hardly clear. In fact, at one point the judge sort of indicates that he's waiting for probation's recommendation. And the prosecutor, in a letter to the judge, where I think it's less likely that he would be dishonest or get carried away as he did in the course of trial, said, and judge, keep in mind that he faces a seven-year sentence in State court for violating his probation. So how do we know that the prosecutor knew that? It's not even clear to me from reading all of the transcripts what the story was, and there was no opinion written when this went down. Well, we know that the prosecutor knew at least that it was up in the air from her response to the motion for a new trial. I'm sorry. No, I've cited the ‑‑ I'll find it in a minute. But in the response to the motion ‑‑ It's on page 16. Page 16? Yeah. The prosecutor, the trial prosecutor says, look, I knew that it was up in the air.  I wanted the ‑‑ I believe that, you know, it should have been told as something like that. You want me to read it for you? Yes. This is what's written by the U.S. attorney in the district court. The transcript attached to Ms. Torres' motion is misleading. That is to say, I think the State court transcript. After that particular hearing, the undersigned AUSA contacted the San Diego district attorney's office to inform them that, in fact, Wilkes' probation had not expired and that Wilkes could and should be sentenced to seven years' custody once he served his federal sentence. The assigned deputy DA later briefed the issue and agreed with his legal conclusion. So that tells us that the AUSA was very much aware of that transcript and that he communicated his view of what should happen to the DA. That turns out, I guess, to be wrong because very shortly thereafter, the seven years is just terminated. Correct. Okay. So we know the U.S. attorney knew about it, and we know that he communicates to the deputy DA over on the State side. Correct. And yet, over and over, during trial, the prosecutor elicits from the witness, you're getting seven years, correct? Yes. Nobody can do anything about that, right? Right. And then in closing argument, pounds it home again. And she uses specific terms. At page 423 of government's ER, she's bolstering Wilkes' testimony. Remember, this is a central part of the government's theme of why Wilkes should be believed because the impeachment evidence that the defense did have goes to his prior drug use, his prior criminality. The government's theme and theory is that Wilkes is now believable because he's turned his life around. He's clean and sober, and he's making amends for his transgressions in the past, including serving a substantial amount of time in prison. So the government attorney argues in closing, what about the seven-year sentence? Did he get out of it? Nope, not at all. No federal court can tell a state court what to do, and that's consecutive, 15 years. Then says later on page 424, so what did he get away with, truly? What did he get away with? All he did was testify to what he saw, what he heard, what he did. He's the only one to man up and give that perspective, the only one. There's nothing wrong with that and should not be held against him. Next page, two pages later, 426. Mr. Wilkes is going to pay for his crime, the past crimes, the present crimes. He's getting away with nothing. Now, how can that be fair to have information that the seven-year consecutive supposed sentence might not even be imposed? The government knows that, doesn't disclose it to the defense, and then exploits that lack of knowledge on the defense by eliciting that from the witness you're going to get seven years consecutive, right? Nobody can do anything about it, right? And then in closing argument, drives it home. And then it's also even more fraudulent because the eight years that he's supposedly getting for sure, the government knows that that's not true at that point. In the excerpt of record, my third volume, under seal, the letter to the court where it's finally explained, the government says, well, we gave him the eight-year deal for the cooperation that he provided up to his guilty plea. And that the testimony was additional. So there was no way in the world that he was going to get eight years. In the plea agreement, they said they were going to file a 5K letter. Right, but it wasn't clear how that was going to shake out because remember, this fellow's guidelines were at 14 years. And so it would take a lot of cooperation just to get anywhere below the eight years that he had as a statutory cap by pleading to two phone counts. Did you try the case? No, I didn't. Was defense counsel aware of the plea agreement in which the prosecutor agreed to, that he would make? That's always subject to the condition that he continue to cooperate or whatever, but that he would make a 5K motion for a fine. The plea agreement is put in my excerpt of record and it does have the standard language that the government can bring a motion. It wasn't disclosed that the eight years, as was finally disclosed at the Wilson case sentencing, that the eight years was already obtained before trial and that additional cooperation was going to go down from there. And so the defense did not have that information. And in terms of the prejudice. I don't understand. I want to be sure. The witness himself says it could be eight years and down. And it's established on the cross that eight was the cap. And the prosecutor has entered into a plea agreement where he also indicates that he would make a motion for a 5K, a downward adjustment. And if the defense counsel was aware of it, then he could have corrected it. He could have used that 5K letter. Well, I guess that's true to a point. But the prosecutor keeps saying that he's going to get eight, lists from him that he's going to get eight. Not that he's going to get more. She argues in closing argument that he's going to get eight. What she did was inexcusable. But, you know, the irony is here is that the defense counsel essentially in the cross corrected it. What she didn't make an issue of was the 5K letter, which was even more suggests that her conduct was even, the prosecutor's conduct was even more egregious. Well, actually, we get two different answers out of Mr. Wilksey during the cross. I'm just reading from the cross. Defense asked, and by pleading guilty, it's not like you just shaved, I'm on, it's SER 108 and 109. After pleading guilty, it's not like you just shaved two years off your sentence. You shave whatever extra guideline exposure you had off your sentence, right? I can't say yes or no, it's 10 and up and now it's eight and down, so that's two years. Defense, is it fair to say that eight years now are capped? Yes. Then it goes on. Defense, and before 10 years with a floor was the bottom. Defense, that was the starting point. Answer, mandatory minimum, right. Defense, could go up from there, right. Defense, so it's not like you just saved two years, right. You saved two years plus the possibility of a higher guideline sentence, right. Whoops. Now, Wilksey, you just said two different things. Right, right. It's not a cap or it is a cap. I don't know. Well, my explanation of that is that the defense believes that the cooperation is the eight years, the deal, because his guidelines are so far above that. How could you possibly believe that? I mean, I don't understand. There's a promise to make a motion for a downward departure. I read the part that Judge Lech just read as saying before the agreement and before the 10 years was the floor, and Wilksey says was the bottom. That was the starting point. Mandatory minimum, right. So this colloquy is designed to distinguish what was happening now as opposed to what happened before he entered the agreement. I just don't think that's a fair reading in light of all the testimony, including the government eliciting from the witness reporter's transcript 72. So you have gone from 17 years to 15 years, still a lot of time, right, meaning that he went from a 10 to life to plus the 7 to 8 plus 7. And I'd like to reserve a few minutes for rebuttal, but if I could turn the Court's attention to the transcript on page 18 of the volume 1 of my ECR. You know, the government now says, oh, well, Wilksey wasn't that big of a deal, but this was the trial attorney arguing to the judge why the motion for new trial on ineffective assistance should not be granted. And he's talking about, this is page 18, it's page 12 of that hearing. What I believe was the linchpin, or certainly I think most persuasive, was the testimony of a co-conspirator, Wilk, who discussed the design of the boat, utility, et cetera, and having that kind of insider's view of the conspiracy was the most important part of the case. And so the government can't have it both ways in that regard. He was the only witness that linked Mr. Torres to this conspiracy directly, and the government thought he was worth quite a bit. It was an extraordinary downward recommendation from a guideline range of over 14 years to no more than three, which turned out to be a time-served sentence of 21 months. Counsel, you're down to about two minutes for reserved time. We'll hear from the state, from the government. Thank you. May it please the Court, Daniel Zip on behalf of the United States. Your Honor, I'll turn first to the Brady misrepresentation claim. The defendant in this case filed a motion for a new trial approximately six months after the trial ended in this case. That motion focused on an effective assistance of counsel claim, and nowhere in that motion before the district court did the defendant raise any of these issues about the Brady, about the misrepresented testimony. And that failure creates a problem on appeal because there's certain important and central factual questions that were never developed below and that go to the heart of the defendant's Brady claim. Couldn't we look at it under plain error? You could look at it under plain error. The problem with that route, I think, is that it's difficult to even put this in the context of what was plain or what wasn't plain without having some understanding of what the prosecutor knew when, what information she had, why she was making these statements. I wasn't the trial counsel on the case, but I spoke with her afterwards, and I think her account of what happened is very different from what the kind of factual basis based on the holes in the factual record that the defense counsel has presented in this opening brief. I mean we have the transcripts of what actually was said. That's true, but I think the confusion in this case goes back first to the motion for new trial. The briefing in that issue, it looks upon first reading as if the U.S. attorney did contact the district attorney after this January 10th hearing to try to clarify whether he was on probation or not. Speaking with her and looking at the transcripts, I think that was actually a reference to a hearing that took place many months before that. As her account, and as supported by the transcripts that we collected for purpose of this appeal, was that well in advance of trial, this first issue came up, this tolling issue of whether he was on probation. She spoke with the deputy district attorney and received word back affirmatively that the Superior Court judge had revoked the probation, that that issue was resolved. And I mean if you look at the September 2009 transcript, that's exactly the judge says your probation is revoked, we're going to set it over, and it's just a matter of sentencing at this point. So when the trial started, the prosecutor, by all accounts, knew that he had been violated his probation and that he was facing a seven-year sentence based on everything the Superior Court judges had said. And that explains why she was making these arguments, why it sounds so assured that he really was getting seven years, because at that point that's all she knew and that's all that anyone knew. You know, this is a problem if we don't have a fully developed record as to what she knew and didn't know, what she should have known or whatever. Typically we deal with Brady claims on 2255s if it's Federal, 2254. Are you saying that we need further factual development before we can decide the Brady claim? I'm not, Your Honor. And I think that it — Because if what he says is true, if his construction of the record is true, actually I'm troubled by the Brady claim. But if it's not true, well, it's not true. Well, I think then the Court can at the very least go to a plain error standard. And I think under — But Brady typically isn't plain error. Or I'll say it this way. If you're on habeas and you've got a Brady claim, that's not subject to a plain error. You just look and see whether there was a Brady violation. Well, I think based on the facts that are before the Court here, even on this record before you, the Court can find that the error that occurred, A, wasn't plain, and B, that it wasn't prejudicial. But plain error is really error by the judge. Brady is misbehavior or omission of good behavior by the prosecutor. Right. And the judge is really not in a position to control for Brady. So it's not really error by the judge at all. Right. Then this is something that should have been brought up at a habeas petition. I don't see how the defense counsel below can completely fail to raise the issue, completely fail to develop the record, and then instead of filing a habeas petition, then direct appeal, raise all these new issues for the first time, and then three years later send it back down for an evidentiary hearing. I mean, this — Well, in a couple of cases, we have remanded to the district court for a Brady hearing to develop the evidentiary record. Blanco's one, and the earlier case, I can't remember the name of it, was decided by Judge Trott. And I think that's sometimes a decent procedure because it's going to go back to the same district judge anyway. So you can file as a 2255. You can send it back to the district judge for the hearing. But I'm less concerned with whether it should be 2255 or remand. What I'm really concerned about is I'm not sure I know what happened. And I guess that's what you're saying. You're not sure either. The record is not fully developed. And I think another avenue the Court has taken in the past, for instance, in the Gomez-Valdez case, is to say, look, if this wasn't raised below and these facts weren't developed below and a Brady claim is raised for the first time on direct appeal, that the issue was waived. It's not a matter of sending it back three years later and allowing a new defense counsel to raise all issues and develop the actual record. I mean, for purposes of judicial efficiency and for fairness to the parties. But you typically don't waive Brady claims because you don't know until afterwards what the information was that the prosecutor had that the prosecutor didn't reveal. Well, that's not the case here. What this defendant had when he filed his motion for new trial, that entire universe of information is what he has on appeal. Nothing changed. It's not this is not a case where a defendant later down the road suddenly discovered that the prosecutor hadn't turned over. So I don't understand. Suppose he had not made any motion for a new trial. Would he have been precluded from filing a petition for rid of habeas corpus? Would this issue have been deemed waived because he didn't make a motion for a new trial, which is theoretically dependent on the discretion of the district court to grant in the interest of justice? I'm not sure my habeas knowledge is up to date. But I do think that filing a habeas petition would have been the appropriate response in this case rather than a direct appeal raising issues on direct appeal. Well, suppose he files a petition for rid of habeas corpus. Are you going to oppose it on procedural grounds or are you going to respond on the merits? That's what I'm getting to. Are you going to say, well, he didn't make a motion for a new trial? Again, I apologize, Your Honor. I have limited to no habeas experience. I don't know the standards or how one would respond to that in the habeas context. I apologize. So putting aside the waiver argument, I think the law suggests that at the very least, if he didn't waive it, that it would be subject to a plain error standard, which would require this court to at the very least look at the prosecutor's statements and see whether those would have affected the outcome of trial had they been changed, had this ambiguity about the seven years been turned over to the defense prior to trial. And I think if you look at a number of factors in this case, it suggests that the prosecutor's statements, had they been changed, would not have made a difference in the outcome of trial. And there's three reasons for that. First, the nature of the prosecutor's statements. You know, throughout the briefs, the defense counsel has done a good job of making this look like it was a question to the jury of 15 years versus he's going to walk out the door in two months. But the reality is that's kind of a 20-20 hindsight. The reality is what the jury would have heard at the time of trial was a difference between he's definitely doing seven years and there's a chance that he might not be doing seven years. What bothers me about this case is I think the jury's led to believe that it's very likely he's going to serve 15 years with maybe time off for good behavior, but he's going to have a sentence in front of him of 15 years. Possibility that the eight years is going to be reduced somewhat if the government likes him and likes what he did, although I find that cross-examination actually ambiguous because, number one, he says it's a cap and then he says it can go up from then, go up depending on the guidelines. But so the jury's told 15 years, he only saved two, maybe if we had construed the cross-examination the way you want to and perhaps are susceptible to that, a little bit of reduction for 15 years. Almost instantly after the trial is finished, he's out with time served. It just doesn't smell right. All right. In speaking with the prosecutor on the case, she was as shocked and furious when she learned about that as anyone. Going through it, everyone was on the same page that this guy was doing seven years, that he had already been violated, and it came as a surprise two months later. So I agree. On first reading, it looks odd, but it really is a symptom of the state court transferring the case for whatever reason to a new judge who really reversed the earlier judge's probation revocation. So Are you not pursuing then the argument that the statement of eight and down doesn't cure the problem? It does. Going to the prejudice argument, I think there's two issues. There's the seven years and then there's the eight-year Federal sentence. On the eight-year, I think that does cure it. I mean, the prosecutor's initial direct examination was inartful. It didn't Mention 15. It mentioned 15. It mentioned starting at 10, going down to 8. But the defense counsel Well, she put in the witness's words, so you're looking at 15 years. He answers yes. Right. So she's basically, in effect, it's a leading question, and it's false. Well, as far as she knew, the seven years was definite. So the question is Well, he got out of the first time he My understanding is that the first time he violated probation, a Federal agent went and whispered in the judge's ear, We need him. He's more important to us than the Federal You know, as a Federal informer. And so he gets the suspended sentence. And the prosecutor says, you know, there's nothing that any Federal judge could do to prevent this from running seven years, running consecutively to the eight-year sentence. There is something that could be done. Not necessarily by a Federal judge, but by an agent going to the judge and saying, let him go. I agree. Those statements are problematic. But I think if you look at the ultimate question here is whether those statements, as corrected by defense counsel immediately afterwards, whether those would have resulted in a different outcome at trial. And I think the answer to that is no. This is a, the corrected testimony would have been maybe he gets out of the seven years, but everyone Well, he knew that he was going to make a Rule 5k motion. I mean, that's what's troubling about this. Or she, the prosecutor, knew that there was going to be a 5k motion. I know it's not before us, but I don't think defense counsel adequately, if he was aware of the plea agreement, made sufficient use of it during the cross-examination. I mean, this is really significant stuff. A 5k letter means he knows that the prosecutor is going to, he's in the hands of the prosecutor. And if the prosecutor is happy with his testimony, then he'll make the 5k motion. And if not, not. And that, in all of the cases that I've tried, is how it gets argued. And it's much more effective. I mean, I know ineffective assistance of counsel is not before us, but it certainly is a problem. Defense counsel indicated to the jury that he was facing an 8 as a ceiling and could go down from that. He could have made a better decision. But you've also got to confront the later question by defense counsel on the same little strand. Defense. So it's not like you just save two years. Right. You save two years plus the possibility of a higher guideline sentence. Answer. Right. So eight lines or ten lines after, he says, eight years is a cap. Well, she says, well, no, it could go up. Right. So I don't know how much is cured by the defense's question or set of questions, I should say. Okay. I guess I don't read it that way. What's the jury supposed to think when it hears that? If I'm a juror and I say, well, it's a cap, and then I hear that it could go up, nobody's talked to me about 5K. Nobody's talked to me. I mean, I'm a juror. I come away from that and I say, huh? My reading was that that 150-month sentence was referring to what he could have received before the agreement and then after the agreement it was 8 and down. Sure. And then finally, going back to prejudice, I think you have to look at what the change in testimony would have been had this been corrected and look at that in light of all the other impeachment evidence that the jury already had about Wilski, the fact that he was a methamphetamine user, he was a convicted felon of a violent felony, that he had lied repeatedly to federal agents. Then you have to look at the fact that the district court judge gave instructions saying take this guy's testimony with a grain of salt. You have the prosecutor in closing statement standing up and saying put his testimony aside. All of these safeguards, all of this other impeachment was already before the jury. Whether this additional change from definitely 7 to maybe 7 and from clearing up the ambiguity as to whether it was 8 years or 8 years or less, I don't think in the entirety of the case that that would have affected the outcome. And you would be making this argument, for example, suppose they didn't disclose to defense counsel that they were going to make a 5K letter, you would still file a, there was part of the plea agreement that they would file a 5K letter, you would still make that argument? I'm not sure. That doesn't seem clearer than the record whether the defense counsel had the information that there was going to be a 5K letter. Well, if he didn't have it, it's a serious problem. You're saying hypothetically if there was. I thought he indicated that defense counsel had it. I mean, maybe it could be clarified. I thought in response to questions when I asked him, he said that he did know about the 5K letter. That was my understanding, yes. So you're saying if he didn't have that? Yes. Would you be arguing that it was harmless error? Yes, I would make the same argument, that in light of all the other impeachment evidence, in light of the strength of the other evidence that's entirely independent of Scott Wilski, that even then, the change, the additional mileage that defense counsel could get out of that would not be enough to change the ultimate outcome of our trial. Thank you, counsel. Your time has expired. Thank you. Mr. Swain, you have some reserved time. Thank you, Your Honor. That just doesn't ring true. This is the only impeachment evidence that goes to his current state of mind. All the other impeachment evidence was in the past, and now he's a reformed man, and it's all predicated in the government's theme, in theory, that he's still manning up, that he's getting out of nothing, he's still paying for his crimes, and it's repeated 15 years, 15 years. Now, there's no need for a remand in my mind, because the facts are crystal clear. The witness lied when he said he was getting seven years consecutive, and nothing was going to happen about that. Nobody could do anything about it. He was in court two weeks before where his attorney, in his presence, said, wait, he's maybe not even on probation. So it was clearly not a certain thing, and he knew it, and it was false when he testified to the contrary. But if it's a Brady claim, the prosecutor has to have some notion that it's false. Right. Well, I guess the government's claim now is, well, that would have been false earlier in 2009, and at some point she thought that maybe it wasn't. But the prosecutors, knowing that it was up in the air during this whole period, and it doesn't disclose anything. Do we know from the record in front of us that the prosecutor, at the time he's on the stand, knows that it was up in the air? I don't know if I can say that. I mean, the inferences, they're meeting with this witness. The witness went to court with his attorney two weeks before this, and she's become best friends with this witness, goes to bat with him, is in constant contact, preparing him for trial. To me, the idea that either the government did know or should have known, because the Brady standard is quite broad in terms of the government's requirements. And so if they know it's going back and forth, and they make no effort to find out, hey, before this seven years, your position was you weren't even on probation, and, in fact, it was a different judge in that court that indicated that she was going to revoke. It was the real judge on the case who then came back, had that final minute order that we have where some mysterious thing was filed under seal, where, no, he's not on probation. Thank you, counsel. The case just argued will be submitted for decision.
judges: Korman, O'scannlain, Fletcher